Filed 7/6/26  P. v. A.N. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E086823 |
| v. | (Super.Ct.No. FELSB25000034) |
| A.N., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Kawika Smith, Judge.  Affirmed.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

Defendant and appellant A.N. filed a petition pursuant to Penal Code section 2966,[1] which the court denied, finding that she met the criteria of an offender with a mental health disorder (OMD).

Counsel has filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*), setting forth a statement of the case and requesting this court exercise its discretion to independently review the record in this case, "Given the serious consequences to appellant of the [OMD] finding and the relatively limited burden this review would place on this court."[2]

---

[1] All further statutory references are to the Penal Code.

[2] Appellate counsel's brief is headlined as a *Wende* brief and cites *Wende* as the applicable law. However, later in the brief, counsel observes that in *People v. Taylor* (2008) 160 Cal.App.4th 304, the court found that *Wende* procedures do not apply to appeals from orders committing a defendant as an OMD; counsel notes that he "does not agree with this conclusion, but it appears to be well established California law."

Appellate counsel notes that he "is at a loss as to how this court would determine whether the applicable law . . . was complied with by the trial court unless it . . . conduct[s] an independent review of the record to determine whether there is sufficient substantial evidence to support the trial court's determination that appellant continues to qualify as" an OMD.

We exercise our discretion to independently review the record for error. (*People v. Delgadillo* (2022) 14 Cal.5th 216, 230 (*Delgadillo*) ["if the appellate court wishes, it may also exercise its discretion to conduct its own independent review of the record in the interest of justice"]; *People v. Pittman* (2024) 99 Cal.App.5th 1252, 1254, fn. 1 [exercising discretion to independently review postconviction order]; *People v. Griffin* (2022) 85 Cal.App.5th 329, 335-336 ["we find the interests of justice call for an independent review of the record as an additional layer of protection"].)

Here, appellate counsel's filing of a *Wende* brief, and this court's *Wende* order, the latter of which did not inform defendant that this court might dismiss the appeal if she did not file a supplemental brief, may have misled defendant to believe that, regardless of whether she filed a supplemental brief, this court would independently review the case. (*Delgadillo*, *supra*, 14 Cal.5th at pp. 222 & 233 [independently reviewing the record for error where the court's order suboptimally failed to indicate that if defendant did not file a brief, the appeal might be dismissed].)

2

We offered defendant the opportunity to file a personal supplemental brief, which she has not done. We affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

On March 1, 2023, officers responded to a call regarding a family disturbance. Defendant's uncle and aunt said defendant, who was on their porch, refused to leave. Her uncle said that as he tried to take out the trash, defendant blocked his path and became "'verbally aggressive attempting to assault him.'"

Defendant became aggressive when officers contacted her. She refused to leave the home. She balled up her fists and swung a flashlight at one of the officers. Officers physically struggled with her when she refused to drop the flashlight. She later grabbed a picture frame and held it over her head in an assaultive manner. After refusing to drop the objects, the officers tased her twice. She then picked up a glass and threw it at the officers.

Defendant eventually fell to the ground, and the officers took her into custody. They searched defendant and found a methamphetamine pipe.

The People filed an information charging defendant with assault upon a peace officer with a deadly weapon with force likely to produce great bodily injury. (§ 245, subd. (c), count 1.) The People alleged as aggravating factors that defendant had previously, twice been convicted of arson, thrice of second degree burglary, and once for forgery. The People further alleged defendant had suffered three prior strike convictions. (§§ 667, subd. (d) & 1170.12, subd. (b).)

3

On May 18, 2023, pursuant to a plea agreement, defendant pled nolo contendere to an interlineated count of threatening an officer (§ 69, count 2); she admitted the three prior strike convictions and aggravating factors.[3]

On August 1, 2023, defense counsel represented that defendant was waiting for approval for placement in the community collaborative court program (CCC). The court found defendant might be suitable for placement in CCC and ordered consideration of defendant for the program.

On August 7, 2023, the court conditionally released defendant on her own recognizance "to a representative of the social model recovery systems dual diagnosis/mental health program [SMRS]."[4]

On September 6, 2023, defendant had been screened and accepted into treatment at SMRS. The court conditionally released defendant to SMRS with a 90-day supply of medication. On October 4, 2023, defendant failed to appear in court as ordered; the court issued a bench warrant.

After being picked up on the warrant, defendant refused to appear in court; defense counsel moved to allow defendant to be rescreened by SMRS, which the court granted. On December 27, 2023, defendant informed the court that she did not wish to

---

[3] The plea agreement and reporter's transcript of the plea are not contained in the record; thus, we do not know precisely what reciprocal agreements were made in return for her plea.

[4] It appears SMRS may be a subprogram within CCC.

participate in CCC.  Defendant was terminated from CCC, and the court transferred the matter "back to the home court . . . for sentencing."

On January 17, 2024, the court sentenced defendant to three years in prison with 465 days of custody credit.  The court recommended defendant be sent to a prison with a mental health support treatment program.

Defendant was paroled on January 27, 2025.  On April 9, 2025, defendant filed a petition pursuant to section 2966, subdivision (b), challenging a determination that as a condition of her parole, she should be treated by the Department of State Hospitals (DSH).  Defendant waived her right to a jury trial on the petition.

All four psychological evaluations considered by the court were conducted prior to defendant's release on parole.  The first two psychologists were scheduled to personally examine defendant; however, defendant refused to cooperate with the evaluations.  The third psychologist was likewise scheduled to evaluate defendant; however, defendant "did not attend the interview for th[e] evaluation due to institutional issues."  Thus, the psychologists relied on "historical documents, recent treatment plans, interdisciplinary notes, and information gathered from previous evaluation[s] . . . ."  Only the fourth evaluator actually met, albeit telephonically, with defendant.

The first psychologist observed that according to progress notes dated October 8, 2024, defendant reported "she was incarcerated because imposters took over her family's home."  When the police were called, "there was orange blood spatter in [the] backyard because whoever's blood [*sic*] had serum so they could get DNA to clone it.  She is a

5

Federal Agent, she has worked for all departments, CIA, FBI, she is a part of all of them. She works undercover." "She believes her children are dead because they were murdered by an opposing government system and they were replaced by clones. They use marine animal DNA, tiger sharks to assist in the cloning process. When she gets out, her goal is to go back to her home and remove the squatters and imposters from her home."

During an eye examination on March 7, 2023, defendant reported that "during a VR game, an RPG exploded, and resulted in an actual explosion, causing facial and orbital damage, and she underwent facial reconstruction with a metal rod. She then stated she had done the surgery herself, using metals that she was able to manipulate and change/restructure her bones. She further claimed to be able to change gold into silver and copper into bronze."

"According to records from county jail, [defendant] presented as hostile, agitated and internally preoccupied, expressed delusional beliefs and threatened to harm clinical staff from December 2023, to March 2024." "In May 2024, she expressed concern that her adoptive family had stolen her genes and used it for her son, and stated that during a prior pregnancy she thought she had a bomb in her body. It was also noted that she was concerned about a cult and the FBI." "She has repeatedly stated that she believed her family members had been replaced by imposters. According to legal records, she has spoken of 'lookalikes,' 'body-doubles,' and 'overlappers.'"

Defendant refused psychotropic medications against medical advice. "At CDCR, she had been diagnosed with amphetamine-induced psychotic disorder . . . ."

The first psychologist noted that defendant "presents with a documented history of expressing delusional beliefs, and these symptoms significantly impact her ability to function." Her "symptoms rise to the level of a severe mental disorder as defined by . . . [section] 2962." The first psychologist opined that defendant met the remaining criteria under section 2962 to be deemed an OMD.

The second psychologist concluded defendant did not have a severe mental health disorder,[5] *did* use force or violence in committing the underlying offense, the offense was not caused by or aggravated by a severe mental health disorder, any mental health issue defendant suffered was in remission, that she had not been in treatment for 90 days or more in the previous year, and that defendant did not represent a substantial danger due to a mental health disorder. Thus, the second psychologist found that defendant only met one of the six criteria for being designated an OMD.

The third psychologist noted that records reflected defendant had admitted attempting to commit suicide on three occasions and being psychiatrically hospitalized on three occasions. Defendant had "presented with delusional thoughts, expressing beliefs consistent with Capgras syndrome, including claims that [her] family members had been killed and replaced by imposters."

Defendant had poor treatment and medication compliance. She was uncooperative, hostile, verbally abusive, and threatening to her clinician. Defendant

---

**5** The second psychologist apparently did not review, and did not reference, the documents reviewed and relied upon by the first psychologist with respect to defendant's delusional and threatening behaviors.

denied having any mental health symptoms, lacked insight, and was unwilling to engage in treatment.

The third psychologist opined, "that chronic and excessive illicit use, such as methamphetamine has led to substance induced psychosis." Nonetheless, he concluded defendant did not have a severe mental health disorder, *did* use force or violence in committing the underlying offense, defendant's offense was not caused by or aggravated by a severe mental health disorder, any mental health issue from which she suffered was in remission, that defendant had not been in treatment for 90 days or more in the previous year, and that she did not represent a substantial danger due to a mental health disorder. Thus, the third psychologist found that defendant met only one of the six criteria for being a designated an OMD under section 2962.

The fourth evaluator noted that defendant was receiving elevated treatment due to her paranoia, delusions, and refusal of medication. The records reflected defendant had two involuntary hospitalizations due to methamphetamine induced psychosis. The evaluator noted diagnostic impressions of unspecified schizophrenia spectrum or other psychotic disorder and unspecified other substance-related disorder. He opined that defendant met all the criteria for being deemed an OMD.

On July 31, 2025, defense counsel filed a brief arguing the court should find that defendant did not meet the criteria of an OMD because two of the four evaluators determined that she did not have a severe mental disorder, she does not have a severe mental disorder, and she did not represent a substantial danger of harm to others.

8

At the hearing on July 31, 2025, the court moved the evaluations into evidence. The People noted the split in the conclusions of the evaluators but argued defendant had a severe mental disorder: "if you look at all of her behavior, she represents the textbook example of delusional disorder, . . . ." "She believes that her family has been replaced by imposters, that their blood's been replaced." "When asked if she had had run-ins with the FBI, she states, 'I used to work for the FBI, I used to work for the Secret Service. I was in the Special Forces. I worked for the FDA, CIA. I am still a field agent regardless.'"

Defense counsel submitted on its trial brief but argued, "it's not just about the 2/2 split, but the fact that also the extenuating circumstances with regards to the committing offense, which is . . . [section] 69. [¶] The Court looks at the circumstances around it too. It's lacking in any indication of any sort of mental illness or psychosis at that moment, which is what the committing offense is all about." The court set the matter over for ruling.

On August 27, 2025, the court noted that it had "read and considered the exhibits and considered the trial brief and the arguments . . . ." The court discussed the four evaluations at length and concluded that defendant met the criteria of an OMD. The court ruled, "the People have met their burden, and the petition is denied."

## II. DISCUSSION

Pursuant to *People v. Kelly* (2006) 40 Cal.4th 106, we have independently reviewed the record for potential error and find no arguable issues.

9

## III. DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

FIELDS
J.

MENETREZ
J.

10